# UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF IOWA
# CENTRAL DIVISION

PAULA K. MILLER,　　　　　　　＊　　CIVIL NO. 4:13-cv-00467-JEG-HCA
　　　　　　　　　　　　　　　　＊
　　　　　　　Plaintiff,　　　　　＊
　　　　　　　　　　　　　　　　＊
　　　v.　　　　　　　　　　　　＊　　　　　**REPORT**
　　　　　　　　　　　　　　　　＊　　**AND RECOMMENDATION**
CAROLYN W. COLVIN, Commissioner　＊
of the Social Security Administration,　＊
　　　　　　　　　　　　　　　　＊
　　　　　　　Defendant.　　　　　＊


Plaintiff Paula K. Miller ("Miller") seeks judicial review of the Social Security Commissioner's decision denying her application for disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401 *et seq.* This Court reviews the Commissioner's final decision pursuant to 42 U.S.C. § 405(g). For the reasons which follow, it is recommended that this matter be remanded for consideration of whether Miller, who was less than six months shy of her fifty-fifth birthday on the date of the decision, should have been classified as being of "advanced age" rather than "closely approaching advanced age."

## I.　PROCEDURAL BACKGROUND

Miller claims she became disabled on March 23, 2010, the day a colander fell off a shelf and struck her head while at work as a cook at Iowa State University. (*See* Administrative Record ("A.R.") 124.) She filed her application for disability benefits on August 24, 2010. (A.R. 122-30.) The Social Security Administration denied the application initially and upon reconsideration. (A.R. 61-64, 67-70.) Administrative Law Judge ("ALJ") John E. Sandbothe heard Miller's claim on March 28, 2012. (A.R. 35-57.) Following the administrative hearing, the ALJ denied Miller's claim in a written decision issued on May 9, 2012. (A.R. 18-34.) Miller timely requested review. (A.R. 15-17.) On September 10, 2013, the Appeals Council denied

review and the ALJ's decision stands as the final decision of the Commissioner. (A.R. 1-6.)

Miller filed a Complaint (ECF No. 1) in this Court on November 10, 2013, seeking judicial review under 42 U.S.C. § 405(g). As described by Miller, her "impairments include cognitive disorder, vertigo, anxiety, and depression." (*Id.* ¶ 3.) She claims that (1) the "ALJ improperly substituted his opinion for the opinion of the treating/examining source," (2) the "ALJ's decision is not supported by substantial medical evidence," (3) the "ALJ improperly rejected [her] subjective allegations," and (4) the "ALJ posed a hypothetical question to the vocational expert that does not adequately describe [her] limitations." (*Id.* ¶¶ 17-20.) She requests that this Court reverse the final decision of the Commissioner or, in the alternative, vacate the decision and remand the matter for further proceedings.

The Commissioner filed an Answer (ECF No. 2) and a copy of the Administrative Record (ECF No. 3) on January 31, 2014. Miller filed a Brief (ECF No. 7) in support of her claims on April 16, 2014. The Commissioner submitted a responsive Brief (ECF No. 8) on June 2, 2014.

Pursuant to 28 U.S.C. § 636(b)(1)(B), the case was referred to this magistrate judge for submission of a report and recommendation regarding disposition. (*See* ECF No. 9.) After reviewing the written submissions, it was determined that a hearing was not warranted. The matter is fully submitted.

## II.  STANDARD OF REVIEW

A district court "will affirm the ALJ's findings if supported by substantial evidence on the record as a whole." *Perkins v. Astrue*, 648 F.3d 892, 897 (8th Cir. 2011) (quoting *Medhaug v. Astrue*, 578 F.3d 805, 813 (8th Cir. 2009)). "Substantial evidence 'is less than a preponderance, but enough that a reasonable mind might accept as adequate to support a conclusion.'" *Renstrom v. Astrue*, 680 F.3d 1057, 1063 (8th Cir. 2012) (quoting *Moore v. Astrue*, 572 F.3d 520, 522 (8th

Cir. 2009)).    The "court must consider evidence that supports and detracts from the ALJ's decision," but "'[i]f, after reviewing the record, the court finds it is possible to draw two inconsistent positions from the evidence and one of those positions represents the ALJ's findings, the court must affirm the ALJ's decision.'" *Cuthrell v. Astrue*, 702 F.3d 1114, 1116 (8th Cir. 2013) (quoting *Perkins*, 648 F.3d at 897).    "Even if substantial evidence supports a contrary outcome, [a court] may not reverse so long as the Commissioner's decision also is supported by substantial evidence." *Randolph v. Barnhart*, 386 F.3d 835, 839 (8th Cir. 2004) (citing *Sultan v. Barnhart*, 368 F.3d 857, 863 (8th Cir. 2004)).

> [A court] will not disturb the denial of benefits so long as the ALJ's decision falls within the available zone of choice.    An ALJ's decision is not outside the zone of choice simply because [the court] might have reached a different conclusion had [it] been the initial finder of fact.

*Buckner v. Astrue*, 646 F.3d 549, 556 (8th Cir. 2011) (quoting *Bradley v. Astrue*, 528 F.3d 1113, 1115 (8th Cir. 2008)(internal quotations and citations omitted)).

The court may reverse the Commissioner's decision if the ALJ's decision is based on legal error. *Neal v. Barnhart*, 405 F.3d 685, 688 (8th Cir. 2005); *see also Lauer v. Apfel*, 245 F.3d 700, 702 (8th Cir. 2001).    "Legal error may be an error of procedure, the use of erroneous legal standards, or an incorrect application of the law." *Collins v. Astrue*, 648 F.3d 869, 871 (8th Cir. 2011)(internal citations omitted).

## II.   REVIEW OF EVIDENTIARY RECORD

Paula Miller was born on October 24, 1957. (A.R. 38.)    In August of 2009, at the age of 51, Miller presented to an Emergency Department doctor with multiple complaints including chest pain, shortness of breath, lightheadedness, heartburn and anxiety. (A.R. 210.)    Miller thought it was "all stress and anxiety" and reported "having family difficulties earlier [that] week" and being "overwhelmed by her job responsibilities" as a cook at Iowa State University. (*Id.*)    She also

complained "of some minimal vertigo." (*Id.*)   Although Miller was pain-free, the doctor advised she be admitted for stress testing but Miller left against medical advice. (A.R. 211-12.)

A month later, in September of 2009, Miller visited Dr. Arthur Check at Story Medical Clinic as a new patient with a weight of 208 pounds and height of 5 feet. (A.R. 279-80.)   It was noted that she had never had a primary care physician and, according to her husband, "she has been slow to act on most health issues and is not anxious to pursue many of them." (A.R. 279.) Miller did not have any current complaints such as "headaches, dizziness, or visual problems." (*Id.*)   The doctor indicated "her hypertension [had] been basically out of control" which led to chest pain and "many trips to the emergency room." (*Id.*)   Miller's past medical history included "[p]unctured inner ear in 1977 with cochlear repair" and "multiple MVCs with closed head trauma." (*Id.*)   The doctor planned to check Miller's past medication then start medication for her blood pressure. (A.R. 280.)

Miller returned to the clinic in November of 2009 and saw Dr. Adrian Palar. (A.R. 276.) Her chief complaints included "[f]ever, diarrhea, sore throat, ear pain and depression." (*Id.*)   It was noted that Miller slept too much, felt tired, and felt bad about herself daily. (*Id.*)   She also "had trouble concentrating for several days" and had expressed to her husband thoughts about hurting herself. (*Id.*)

A December 2009 mammogram revealed an abnormality, felt likely to be a lipoma, in Miller's breast. (A.R. 220-21.)   The mass was assessed as "highly suggestive of malignancy" and a biopsy was recommended. (*Id.*)   It was explained that it could be breast cancer, but Miller did not want a biopsy. (*Id.*)

On March 23, 2010, at the age of 52, Miller reported suffering an injury while working at Iowa State University. (A.R. 276.)   In a written Job Injury Report dated March 24th, Miller

described the accident as follows: "colander on top shelf shifted and rolled off and hit right between the eyes." (*Id.*) She reported immediately feeling "pain - vision blurry" and described her complaints as "pain – bloody noses, bruising." (*Id.*) She indicated the pain was severe and constant. (*Id.*)

On March 25, 2010, Miller visited the McFarland Clinic and was assessed by Physician Assistant Mark Morris and Dr. Charles Mooney for complaints relating to the accident including headaches, "dizziness (worse with bending, standing up or turning), some blurred vision, pain to the area." (A.R. 299-301.) The past medical history for Miller indicated she had hypertension, cardiomyopathy and "an MVA in the 1990s when she also had a concussion which resolved over time." (A.R. 299.) Miller's subjective complaints during the visit were noted as follows:

> She says that 48 hours ago, on 3/23/10, approximately 4:00 p.m. in the afternoon, she was hit between the eyes on the bridge of her nose by a colander. While she did not have any loss of consciousness, and originally no pain or discomfort, she did have a small laceration over the bridge of the nose which bleed briefly. Approximately 2 to 4 hours later she started developing quite a bit of pain and discomfort in the front of her head. She started developing some vertigo with flexion and extension of the neck, specifically, with a sensation as if the blood was rushing to her face. She has had some nausea, no vomiting. She denies any changes in mood or memory. She was able to drive herself here to the clinic today.

(*Id.*)

Upon examination, it was noted that there was "a small 0.5 cm laceration over the bridge of the nose which [was] clean, dry, and well-healed. . . . There [was] no surrounding edema." (A.R. 300.) Miller "complain[ed] of some blurred vision on the right." (*Id.*) In regard to her neurologic condition, it was noted Miller

> was unstable with the Romberg but did not fall. She was unable to perform a tandem walk. With gait in the examination room she was able to walk across the clinic without any difficulty, but upon leaving the examination room was noted to be tracing the walls. Finger nose test for coordination was accomplished without any difficulty as was heel to shin test.

5

(*Id.*)    She was assessed with a "[h]ead injury and possible nasal fracture." (*Id.*)    It was noted that Miller "was taken off work, even though she was adamant that she could return back to work, but clearly given her instability this was not advisable." (*Id.*)    She was instructed not to drive and a family member was called to pick her up. (*Id.*)

Miller returned to the McFarland Clinic on April 2, 2010, after a head CT and sinus CT had been performed. (A.R. 311-13.)    Both tests came "back negative with the exception of some evidence of chronic mucoperiosteal thickening of the . . . sinuses." (A.R. 311.)    According to the clinic notes, Miller reported as being

> 50% better since her last visit. She still has an intense headache mostly in the frontal area of her face, over the bridge of her nose, that seems to get worse at night when she tries to go to sleep and she thinks fixates on the discomfort. Furthermore, she continues to be vertiginous when looking up and down and feels that she cannot drive. However, she is adamant that she wants to return back to work at ISU. . . . Her nausea has resolved. She has never had any vomiting. She denies any visual changes with the exception of when looking down into the left and having a spot in her left visual field. She denies any memory changes or losses.

(*Id.*)    The objective findings included that the laceration was "completely resolved" but indicated problems with Miller's neurologic condition:

> Memory, speech and gait are grossly normal. Fine motor skills such as stand and walk were attempted in the hallway of the clinic and she was unable to perform tandem walk whatsoever. She had to look down and fixate on her feet when attempting tandem walk, which is interesting, as this seems to make her vertigo worse per her complaints. With regular ambulation, she would weave down the hallway, often tracing the walls for support. She was unable to perform a Romberg. While seated, a Dix-Hallpike maneuver was attempted to elicit her vertigo but due to complaints of chronic back pain she states that she was unable to perform this maneuver.

(*Id.*)

Miller was assessed with "[b]lunt head trauma with facial headache and vertigo." (*Id.*) Based on a review of the CT scans, P.A. Morris "reassured [Miller] that there is no acute abnormality other than her chronic sinus issues which are unrelated to the trauma." (*Id.*)    He

further noted:

> Given the limited amount of trauma she specifically had, other than the small abrasion over the nose, specifically no raccoon eyes, no nasal bone fracture, no subconjunctival hemorrhages, I am concerned about how symptomatic she is with regard to vertigo and headache. . . . However, due to her gross gait instability, I feel that she cannot return back to her regular duties at this point. She may, however, return back to seated work only if they can accommodate that restriction as long as she is not operating hazardous machinery or driving. . . . I think given her significant subjective complaints, given her minimal objective evidence of trauma, an ENT or Neurology consult may be necessary.

(A.R. 311-12.)

On April 12, 2010, Miller visited Dr. Adrian Palar regarding her medications. (A.R. 264.) She complained of dizziness, which Dr. Palar noted was related to her work injury. (*Id.*) Miller also complained of "feeling stressed out and anxious" and "sometimes waking up with a pounding headache." (*Id.*) Dr. Palar noted Miller's gate was "unstable" and she "seems to lean to one side at one time but she did not fall." (*Id.*)

Later the same day, Miller visited the McFarland Clinic again. (A.R. 314-15.) According to Physician Assistant Morris' notes, Miller reported that her headaches had "virtually resolved. However, her vertigo this morning [had] become much worse. She feels as if the room is spinning around her. She has not been at work since the injury." (A.R. 314.) P.A. Morris observed that Miller, when entering the room, had "difficulty stabilizing herself, tracing the walls and the doorframe. She was unwilling without assistance to move from a seated position in a chair to the examination table." (*Id.*) After consulting Dr. Mooney by phone, P.A. Morris stopped Miller's medications of meclizine, amitriptyline, and Darvocet, and instead prescribed Tylenol. (*Id.*) Miller was referred to physical therapy for vestibular rehabilitation and to Dr. Juan Acosta for neurological evaluation. (A.R. 314-15.) She was to remain "on the same work restrictions of seated work only. No operating hazardous machinery or driving vehicles." (A.R. 315.)

Miller had an initial evaluation by the physical therapist on April 29, 2010. (A.R. 294-95.) Miller reported she "had dizziness since" the accident and "[f]eels this is slowly getting better, but continues to have problems." (A.R. 294.) It was further noted that Miller was

> off work since the incident. She reports that she is sleeping quite a bit. Unable to perform driving or housework. Must hold onto a wall with walking. She must sit when going down the stairs. Overall is having difficulty looking to the left for any activities.

(*Id.*) Upon examination, the physical therapist found Miller "ambulates by holding onto someone," "has ability to stand with static standing," but was "[u]nable to stand with eyes closed. She must hold onto objects to be able to tolerate moving her lower extremities for balance testing." (*Id.*) Testing was "positive for nystagmus with saccadic eye movements [and for] for vestibular ocular motor reflex with slow head movements." (*Id.*) The physical therapist's general impression was that the findings were "consistent with vertigo. At this point, patient is demonstrating vertigo on the horizontal canal bilaterally and on the right anterior/posterior." (*Id.*) It was noted that "[t]he rehabilitation potential for this patient is fair to good." (*Id.*)

During a subsequent physical therapy session on May 3, 2010, Miller continued "to complain of ataxia with walking" and of the need to "hold onto an object or a person with ambulation." (A.R. 293.) The physical therapist discussed the "possible need for an assistive device," but noted Miller was "reluctant to do that at this time." (*Id.*) It was noted that Miller had "significant" and "severe" vertigo during the treatment. (*Id.*)

On May 4, 2010, Miller was seen by Dr. Juan Acosta at the McFarland Clinic for a neurology evaluation. (A.R. 317-20.) Miller's chief complaint was dizziness or vertigo which had persisted since the March 23rd accident, along with headaches and complaints of diplopia. (A.R. 317.) It was noted that "[h]er symptoms have slowly gotten better. She is not currently working. She has not been able to drive." (*Id.*) Miller "persistently repeat[ed] during the

interview that she wants to go back to work." (*Id.*)  Upon examination, Dr. Acosta found Miller "was able to walk without assistance" and noted:

> She is cautious because she feels is going to fall but she is not falling. Her base was normal but at times she increased the base to walk (not all the time). She uses her hands at time for stability. She was able to walk on her toes and heels. She is able to tandem but uses her hands to hold to the wall, however, I don't see her breaking the line of walk. Romberg was negative.

(A.R. 319.)  Dr. Acosta provided the following assessment and plan:

> Her neurological examination was essentially normal except for some episodic vertigo as described above. I did not find eye movement abnormalities, nystagmus, or weakness. Her vertigo does not fit criteria for benign positional vertigo. She has some kind of post-traumatic vertigo but I cannot pinpoint the exact etiology. Meniere's disease can produce vertigo and tinnitus. It will be coincidental though that presents so acutely after her trauma. She does not have hearing loss though. I don't find elements to suggest a central cause of vertigo and I would not recommend MRI of the brain at this time. She has responded to Meclizine. I will restart this medication to see if her symptoms improve. Physical therapy may help too. Her headaches seem to be part of the same post-traumatic injury and treatment with tylenol or NSAIDs may be enough.

(*Id.*)  He recommended referral to ENT for further evaluation but found "[n]o need for additional studies from the neurological point of view." (*Id.*)

A few days later, on May 7th, Dr. Mooney reevaluated Miller. (A.R. 321-22.)  Miller told the doctor she had slipped and fell on ice, hitting her head, in January of 2010, but did not seek medical treatment because she thought she was fine. (A.R. 321.)  It was noted that she did not begin having vestibular dysfunction until after the March 23rd work accident. (*Id.*)  Dr. Mooney made the following objective findings:

> Examination reveals she walks down the hall, putting her hands on the walls to steady herself. She will hold to the right and then to the left. She does not appear to actually be falling to one side or the other. Her Romberg testing is very reluctant, but she does not appear to distinctly fall to one side or the other. She does not demonstrate any vertigo.

(*Id.*)  He assessed Miller as having "[s]ymptoms of minor closed head trauma." (*Id.*)  In his

opinion, the colander accident "did not result in any significant head trauma. In fact did not result in anything more than a very minor cut on her nose until she began having symptoms shortly thereafter of vertigo." (*Id.*)   Dr. Mooney referred Miller for an ENT evaluation, ordered an audiogram, and noted she would not be able to return to work until those were completed. (*Id.*) He also refilled her prescription for meclizine. (*Id.*)

Miller continued her physical therapy treatments.   During a May 11th session, Miller reported as being "a little less dizzy since starting physical therapy." (A.R. 292.)   She required support while performing a modified Epley maneuver for her left ear and other balance activities. (*Id.*)   On May 12th, Miller reported being "less whirly" but having "double vision in bilateral eyes. She continues to have ataxia and difficulty with gait." (A.R. 291.)   After working on gait training with a wheeled walker on May 17th, the physical therapist requested, in agreement with Miller, a prescription for the device from Dr. Mooney. (A.R. 290.)   Dix-Hallpike testing was positive during the sessions. (A.R. 290, 292, 293.)

On May 21st, Miller reported to her physical therapist that she had walked 50 yards at a Walmart store using a cart for support, but "then needed to sit down due to nausea." (A.R. 289.) She indicated she was "unable to ambulate without holding onto someone." (*Id.*)   Miller's balance was assessed using the Berg Balance Scale which placed her at a "medium risk for falling." (*Id.*)   She had the most difficulty with standing with her eyes closed and picking up an object on the floor. (*Id.*)

On May 24th, Miller informed the physical therapist that she had purchased a cane and was using it at all times, with increased feelings of safety. (A.R. 288.)   Dynamic gait testing was performed and placed Miller at a "high risk for falls." (*Id.*)   Miller was "unable to perform ambulation with head turns without severe loss of balance" even with use of the cane. (*Id.*)

Miller revisited Dr. Mooney on May 26th. (A.R. 337.)   It was noted she had "made some progress in physical therapy" and was "now using a cane to assist her in walking" but still felt "very unsteady on her feet." (*Id.*)   Dr. Mooney further noted that Miller was "not reporting true vertigo symptoms at" the time. (*Id.*)   His examination revealed

> that Romberg testing results in her falling backwards. Her gait is still markedly abnormal and she appears very fearful even when ambulating from the examination chair to the examination table. Sitting on the examination table she is fearful of closing her eyes for the fact that she feels that she will fall. She does not demonstrate any nystagmus.

(*Id.*)   In his assessment, Dr. Mooney noted Miller's "[o]ngoing complaints of dizziness" and opined as follows:

> I did review the mechanism of her injury with the information provided by her employer. It is certainly unusual that she would have the degree of complaints based on the very minimal impact of the colander which struck her on the nose. In reviewing Dr. Acosta's notes, he does not find a reason for a central source of her dizzy symptoms and ENT evaluation is pending.

(*Id.*)   Dr. Mooney did not believe Miller was "fit to return to work" and would not recommend her doing so "while using a cane for assisted walking." (*Id.*)   Miller became upset with Dr. Mooney because she wanted to return to work. (*Id.*)   The doctor noted that he did "not know that there [was] any additional intervention" that could be offered at that time, other than wait for the results of the ENT examination. (*Id.*)

On May 28th, Miller reported to her physical therapist that she had "tried to be somewhat more active at home" and had started to help with some household chores. (A.R. 286.)   She still used a cane when walking but in stores she used a wheelchair if available. (*Id.*)   While turning left or looking down caused vertigo, she felt the vertigo improved "75% to 85%." (*Id.*)   During the session, Miller could stand with her eyes closed for 8 seconds before losing her balance. (*Id.*)   Testing revealed Miller was "[p]ositive for nystagmus with eye movements . . . [and] for slow

vestibule ocular motor reflex," and she had "saccadic eye movements with smooth pursuit testing." (*Id.*) She was also "positive with benign paroxysmal positional vertigo testing." (*Id.*) The physical therapist noted Miller continued "to have decreased balance, but has made improvements in mobility in using a single-point cane." (A.R. 287.)

Physician Assistant Kevin Prater performed an ENT evaluation of Miller on June 22, 2010. (A.R. 340-41.) Upon his physical examination, he noted: "Stance and gait are profoundly impaired. Romberg is positive with eyes open or closed. Tandem gait is impossible. Dix Hallpike maneuvers elicit a strongly positive horizontal nystagmus." (A.R. 341.) Audiometric testing demonstrated normal hearing. (*Id.*) The resulting impressions were "Non-specific dysequlibrum" and "Evoked Horizontal Nystagmus." (*Id.*) P.A. Prater further noted that Miller's evoked nystagmus "certainly suggest of canalithiasis, likely, left horizontal canal." (*Id.*) P.A. Prater wanted to proceed "with an ENG [electronystagmogram] to obtain some objective data that could guide her treatment." (*Id.*)

Miller returned to Dr. Mooney on June 29, 2010. (A.R. 342.) In contrast to the ENT evaluation, the doctor's examination revealed that Miller did "not have a distinctly positive Romberg standing." (*Id.*) Dr. Mooney did find, however, that Miller had "a wide based gait and tends to fall to one side unless she is essentially walking stiff-legged." (*Id.*) In response to Miller's ongoing complaints, Dr. Mooney opined: "Certainly her findings are dramatically out of proportion to the degree of her injury. However, given her past history, I cannot exclude an ongoing vestibular problem." (*Id.*) He agreed with the need for a neurologic ENT examination and the ENG, and noted that "[a]t this point I do not feel she is capable of returning to work." (*Id.*)

On July 16, 2010, a video nystagmagram performed on Miller revealed "no observed abnormal nystagmus." (A.R. 344.) P.A. Prater recommended evaluation at a tertiary balance

center. (*Id.*)  He noted that "[t]he weight of [the colander] seems to change each time I visit with [Miller]." (*Id.*)

During a subsequent visit with Dr. Mooney on July 21, 2010, Miller indicated "that overall she is doing better. However, she continues to walk with a cane." (A.R. 345.)  In assessing Miller's symptoms of ongoing imbalance, Dr. Mooney stated:

> I do not know that there is much more really to do. I would like to see the results of the electronystagmogram and the ENT final opinion. I am at a loss to explain her symptoms and continue to feel that her symptoms are vastly outside of any of the objective findings or even a mechanism of injury.

(*Id.*)  Dr. Mooney would not release Miller to return to work until she made progress in physical therapy or he reviewed the ENG. (*Id.*)

Miller was again seen by Dr. Mooney on August 9, 2010, who noted that Miller "has made no progress and continues to demonstrate inconsistencies" during physical therapy. (A.R. 346.) He also noted that Miller had "been noncompliant having missed 4 visits in her therapy" and had no explanation. (*Id.*)  Miller "again asked if she could return to work" but Dr. Mooney did not believe that was "possible based on her physical therapy report and the fact she now feels she needs a cane because of instability." (*Id.*)  Dr. Mooney found the results of the ENG to be "not very positive and in fact are not reproducible." (*Id.*)  He provided the following assessment:

> It is my opinion that her complaints are vastly outside of any known cause based on the mechanism of her injury. I discussed this with her and her husband who became confrontational with me and demanded permanent disability.
>
> I do not feel at this point that any of her current complaints are related to her injury and I discussed this with her. I feel if any additional evaluation is to be done, it should be done by Neuro/ENT and perhaps a psychiatrist might need to be involved based on her complaints. I do not see any reason for followup here in Occupational Medicine. It is my opinion she is incapable of returning to work based on her last physical therapy report, the inconsistencies noted preclude any opinion regarding actual functional abilities.
>
> . . . It is my opinion that Mrs. Miller is certainly at maximum medical improvement

as it relates to the minor trauma to her nose. It remains my opinion that the trauma which she suffered was inconsequential and not related to her current complaints.

(*Id.*)

Miller returned to see Dr. Adrian Palar at the Story Medical Clinic in mid-August to refill her medication. (A.R. 259.)    Miller stated to Dr. Palar that "they gave up on me." (*Id.*)    Dr. Palar noted a "[h]ead CT scan was obtained and reportedly this was unremarkable. Patient, however, still has the dizziness and imbalance." (*Id.*)    He observed Miller's gait to be "mildly unsteady" while walking with a cane. (*Id.*)    He found Miller's hypertension was "well controlled," and her anxiety disorder and depression were "controlled' with medication. (*Id.*)    Dr. Palar ordered a handicapped parking permit for Miller due to her dizziness and imbalance, and recommended she continue to see "the work comp physician", Dr. Mooney, for her dizziness. (A.R. 259, 284.)

Miller called to speak with Dr. Palar on August 27, 2010. (A.R. 257.)    A written message taken by the doctor's staff noted: "lawyer wants pt to be released to go back to work.    pt still using a cane & dizzy though pt wants to know how she is supposed to work in her condition?" (*Id.*)

In a progress note for Miller's employer dated August 30, 2010, Dr. Mooney reported as follows:

> Ms. Miller did not improve symptoms of gait instability in physical therapy. Consultations and workup to date failed to provide any objective evidence for vestibular dysfunction and therefore she was released from care on 08/09/2010.
>
> It is my opinion based on the Guides to Evaluation of Permanent Impairment, published by the AMA, that Ms. Miller demonstrates no evidence of partial permanent impairment as it relates to the blow to her nose.    It is my opinion that the balance of her complaints are not objectifiable and not related to this injury occurring on 03/23/10.

(A.R. 347.)

At the referral of the Disability Examiner, Miller was seen by Dr. Kenneth Mills for a

neuropsychological assessment on January 6, 2011. (A.R. 383.)   Miller indicated she was applying for Social Security Disability benefits because of "ringing in her ears, a constant 'blinding' headache, imbalance requiring a cane to remain standing up, and blurred vision." (*Id.*) Dr. Mills reviewed with Miller her social/vocational/educational, medical, somatic, and psychological history. (A.R. 383-86.)   Dr. Mills also reviewed the case note from Dr. Adrian Palar dated August 26, 2010. (A.R. 386.)

Dr. Mills observed that Miller "ambulated cautiously, with the assistance of a single-point cane. She demonstrated apparent full range of upper extremity motion. Manual dexterity was adequate for testing purposes." (*Id.*)   Dr. Mills tested Miller's attention and concentration during which Miller performed "in the severely impaired range for her age group, quite errorful and 7.7 standard deviations slower than the mean." (A.R. 387-88.)   Miller also completed a test for auditory memory in which she performed "within the Low Average range, yielding a cumulative score that was 1.1 standard deviations below the mean for her age and gender." (A.R. 388.)   The test results also reflected "borderline range auditory recall." (*Id.*)   Additional personality testing revealed severe depression and severe anxiety. (*Id.*)

In his analysis, Dr. Mills concluded that the test data revealed "slowed mental processing and borderline auditory recall. Although demonstrated affect was normothymic, she reported ongoing symptoms of severe anxious depression." (A.R. 389.)   His diagnosis included "Adjustment Disorder, With Mixed Anxiety and Depressed Mood, Cognitive Disorder, Not Otherwise Specified, Postconcussional Syndrome, Hypertension, well controlled, Tinnitus, Dizziness, Chronic headache, Vocational concerns." (*Id.*)   Dr. Mills described the vocational implications from the evaluation as follows:

> This client appears to be able to accomplish her basic activities of daily life . . . with
> no assistance.   She would appear to be competent to manage cash benefits.

Ms. Miller would likely be able to understand basic instructions, procedures and locations on the work site, if they were rehearsed several times. She may require direct supervision and frequent repetition to learn job responsibilities. Her mnestic abilities are poor, however, and frequent reminders may be necessary.

Ms. Miller's ability to carry out job-related instructions may be limited by her poor recall. Maintenance of attention, concentration, and pace may be somewhat impaired, as a result of her mnestic compromise.

Ms. Miller's ability to interact appropriately with co-workers, supervisors and the public would appear to be within normal limits, except during periods of exacerbated depression.

Ms. Miller may experience mild difficulty adjusting to significant changes in the work place. Her ability to use good judgment in the workplace may be limited by her anxious depression. During periods of increased depression and anxiety, her capacity for adjustment may decline further, as may her ability to use good judgment in the workplace.

(A.R. 389-90.)    Because Dr. Mills believed that the full extent of Miller's cognitive abilities could not be discerned within the limitations of the mental status examination, he recommended a full neuropsychological assessment. (A.R. 390.)

Miller began visiting a free clinic for her health care needs and medication. (A.R. 416-19.) On April 28, 2011, she complained of head pain, ongoing memory difficulty and depression. (A.R. 418.)    On June 9, 2011, she was assessed with depression, head injury and short-term memory loss. (A.R. 417.)    On August 25, 2011, she visited the clinic after falling down stairs and spraining her ankle. (A.R. 416.)

## IV.    PROCEEDINGS BEFORE THE ALJ

Miller presented testimony to Administrative Law Judge John E. Sandbothe on March 28, 2012. (A.R. 35-57.)    She testified that while at work on March 23, 2010, "[a] pot hit [her in the face] from the top shelf" which caused "[d]izziness, being ill, memory loss, ringing in [her] ears, pain." (A.R. 38-39.)    Miller liked her job and was planning on returning to work. (A.R. 39.)

When asked why she was unable to return, she explained: "Oh, my dizziness and my . . . can't pick things up without falling over. I've got an equilibrium problem. I can't . . . remember a lot of things now. You know, like I used to." (A.R. 40.)   She further claimed she had constant pain including "[m]igraines all the time, my neck hurts. I don't have any cushion there. My leg goes – left leg goes numb. I shake." (*Id.*)   Her migraines occur once or twice a week, requiring her to be in a quiet and dark room, and last two or three hours. (A.R. 40-41.)   She has difficulty with sleeping because of her pain. (A.R. 50.)   In addition to memory problems, Miller has difficulty with concentration. (A.R. 41-42.)

Miller also claimed to have difficulty picking up smaller objects such as a potato peeler or a cup without a handle, and drops "a lot of things." (A.R. 43-44.)   She becomes dizzy if she reaches overhead or looks up. (A.R. 44.)   She crawls up stairs but is able to grab the wall and walk "straight legged down." (*Id.*)   She uses a cane every day and is "dizzy and off balance without" it. (A.R. 46.)   She can only walk a half-a-block with the cane before needing to stop. (A.R. 47.)   She stated she could only sit in a chair 20 or 30 minutes before her "hip goes to sleep or [her] back" and she has migraines. (A.R. 48.)   She also expressed problems with falling out of chairs without arms. (*Id.*)

Miller does not understand how to use a computer. (A.R. 45.)   She does not cook because she "left a pan on the stove, [forgot it was on], and boiled it dry." (*Id.*)   She does not clean because she "can't push or pull" or "stand without being supported." (*Id.*)   She has a driver's license but had not driven for the approximate 2 years since her work accident because of her dizziness. (A.R. 50.)

In Miller's opinion, the physical therapy "didn't help a whole lot" and medication did not help alleviate her dizziness. (A.R. 53.)   She still wants to return to work. (A.R. 54.)

A vocational expert, Carman Mitchell, also testified in response to hypothetical questions posed by the ALJ. (A.R. 54-56.)   The questions were based on a "54-year-old woman with 15 years of education, past relevant work as a cook . . . diagnosed with cognitive disorder, vertigo, depression and anxiety." (A.R. 55.)   The first hypothetical was given the following limitations: "No balancing, no climbing, no hazards. Simple, routine, repetitive work, superficial contact with the public, regular pace." (*Id.*)   Under that scenario, the vocational expert testified that the woman could not return to her past work but there are other jobs she might perform including marker, photocopy machine operator, and unskilled mail clerk. (A.R. 55-56.)   Under the second hypothetical, the following limitations were added: "she could only be on her feet two hours total during the workday, and she would require the use of a cane." (A.R. 56.)   The vocational expert testified that she would then be limited to sedentary work. (*Id.*)

## V.   FINDINGS OF THE ALJ

After the hearing, the ALJ made the following findings in the written decision issued on May 9, 2012:

1.    The claimant meets the insured status requirements of the Social Security Act through December 31, 2015.

2.    The claimant has not engaged in substantial gainful activity since March 23, 2010, the alleged onset date (20 CFR 404.1571 et seq.).

3.    The claimant has the following severe impairments: cognitive disorder; vertigo; depression; and anxiety (20 CFR 404.1520(c)).

4.    The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5.    After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except she can never balance, climb, or perform work around hazards such as moving machinery or dangerous equipment. The claimant can perform only simple, routine, repetitive work that is of no more than regular pace and involves only occasional or

superficial contact with the public.

6.      The claimant is unable to perform any past relevant work (20 CFR 404.1565).

7.      The claimant was born on October 24, 1957, and was 52 years old, which is defined as an individual closely approaching advanced age, on the alleged disability onset date (20 CFR 404.1563).

8.      The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564).

9.      Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.    Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569 and 404.1569(a)).

11.    The claimant has not been under a disability, as defined in the Social Security Act, from March 23, 2010, through the date of this decision (20 CFR 404.1520(g)).

(A.R. 23-29.)   The ALJ then concluded: "Based on the application for a period of disability and disability insurance benefits filed on August 18, 2010, the claimant is not disabled under section 216(i) and 223(d) of the Social Security Act." (A.R. 30.)   On the date of the ALJ's decision (May 9, 2012), Miller's age was approximately 54 years and six and a half months.

## VI.  DISCUSSION

A claimant is disabled if she is unable "'to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months.'" *Pate-Fires v. Astrue*, 564 F.3d 935, 942 (8th Cir. 2009) (quoting 42 U.S.C. § 1382c(a)(3)(A)).   "The [Social Security Administration ("SSA")] has established a five-step sequential process for evaluating disability claims." *McCoy v. Astrue*, 648 F.3d 605, 611 (8th

Cir. 2011).

> Step one determines whether the claimant is involved in substantial gainful activity. §§ 404.1520(a)(4)(i),(b); 416.920(a)(4)(i),(b). If so, the claimant is not disabled; if not, step two determines whether the claimant has a "severe" medically determinable impairment (or combination of impairments). §§ 404.1520(a)(4)(ii),(c); 416.920(a)(4)(ii),(c). If there is no severe impairment, the claimant is not disabled; if there is, step three determines whether the impairments are severe enough to meet a predetermined list of conditions (with duration requirements). §§ 404.1520(a)(4)(iii),(d); 416.920(a)(4)(iii),(d). If so, the claimant is disabled; if not, step four considers the residual functional capacity of the claimant - previously determined by the ALJ - and evaluates whether the claimant has the residual functional capacity to complete his or her past relevant work. §§ 404.1520(a)(4)(iv),(f); 416.920(a)(4)(iv),(f). If the claimant can complete past relevant work, the claimant is not disabled; if not, step five considers the claimant's residual functional capacity, age, education, and work experience to determine whether the claimant can do other work. §§ 404.1520(a)(4)(v),(g); 416.920(a)(4)(v),(g). If so, the claimant is not disabled; if not, the claimant is disabled.

*Cuthrell*, 702 F.3d at 116-17; *Boettcher v. Astrue*, 652 F.3d 860, 862 (8th Cir. 2011).

Here, in her brief, Miller acknowledges the ALJ followed the five-step process but asserts the following challenges to his decision: (a) the ALJ failed to evaluate the medical opinions from Miller's treatment team, Dr. Charles Mooney and Physician Assistant Mark Morris, that Miller was limited to seated work, if she could work at all; (b) the ALJ failed to properly evaluate Miller's need for a cane or assistive device for standing and walking; (c) the ALJ failed to properly evaluate the opinions of Dr. Kenneth Mills; and (d) the ALJ erred in applying the medical-vocational guidelines in a mechanical manner where Miller was 54 years, 6.5 months old as of the date of the ALJ's decision and is disabled if 55 years old ("advanced age"). (*See* Plaintiff's Brief pp. 4, 11-25.) For those reasons, Miller contends the ALJ's decision should be reversed and this matter remanded for further proceedings. Each of the issues raised by Miller are addressed in turn.

A.    WHETHER THE ALJ FAILED TO PROPERLY EVALUATE THE OPINIONS OF DR. CHARLES MOONEY AND PHYSICIAN ASSISTANT MARK MORRIS.

Miller contends that the ALJ failed to address "several medical opinions that limited [her]

to working from a seated position, if she returned to work at all." (Plaintiff's Brief p. 11.) Specifically, she refers to the opinions of Dr. Charles Mooney and Physician Assistant Mark Morris from the McFarland Clinic. (*Id.* pp. 11-12.)   Although in her brief Miller contends that "[t]he ALJ's failure to evaluate and incorporate the treatment team's limitations is immaterial error" (*Id.* p. 13.), this magistrate judge believes that to be a typographical error when considered in the context of the brief.

Social Security Administration regulations address the manner in which medical opinions, including those of a treating physician, are considered. *See* 20 C.F.R. § 404.1527.   Under those regulations, a treating physician's opinion is due "controlling weight" if that opinion is "'well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] record.'" *Prosch v. Apfel*, 201 F.3d 1010, 1012-13 (8th Cir. 2000) (quoting 20 C.F.R. § 404.1527); *see also Singh v. Apfel*, 222 F.3d 448, 452 (8th Cir. 2000) ("A treating physician's opinion should not ordinarily be disregarded and is entitled to substantial weight.").   "By contrast, 'the opinion of a consulting physician who examines a claimant once or not at all does not generally constitute substantial evidence.'" *Singh*, 222 F.3d at 452 (alteration omitted) (quoting *Kelley v. Callahan*, 133 F.3d 583, 589 (8th Cir. 1998)).

"Although a treating physician's opinion is entitled to great weight, it does not automatically control or obviate the need to evaluate the record as whole." *Hogan v. Apfel*, 239 F.3d 958, 961 (8th Cir. 2001).   An ALJ may appropriately discount or disregard a treating physician's opinion "where other medical assessments are supported by better or more thorough medical evidence, or where a treating physician renders inconsistent opinions that undermine the credibility of such opinions." *Anderson v. Astrue*, 696 F.3d 790, 793 (8th Cir. 2012) (quoting *Wildman v. Astrue*, 596 F.3d 959, 964 (8th Cir. 2010)); *see also Hamilton v. Astrue*, 518 F.3d 607,

610 (8th Cir. 2008); *Hogan*, 239 F.3d at 961. "[I]f a doctor evaluates a patient as having more physical limitations than the patient actually exhibits in her daily living, an ALJ need not ignore the inconsistency." *Anderson*, 696 F.3d at 794. "Moreover, a treating physician's opinion does not deserve controlling weight when it is nothing more than a conclusory statement." *Hamilton*, 518 F.3d at 610 (citing *Piepgras v. Chater*, 76 F.3d 233, 236 (8th Cir. 1996)); *see also Anderson*, 696 F.3d at 794 ("[A] conclusory checkbox form has little evidentiary value when it 'cites no medical evidence, and provides little to no elaboration.'" (quoting *Wildman*, 596 F.3d at 964)).

"Whether the ALJ gives great or small weight to the opinions of treating physicians, the ALJ must give good reasons for giving the opinions that weight." *See Hamilton*, 518 F.3d at 610; *see also Martise v. Astrue*, 641 F.3d 909, 925 (8th Cir. 2011) (quoting *Brown v. Astrue*, 611 F.3d 941, 951-52 (8th Cir. 2010)); *Davidson v. Astrue*, 501 F.3d 987, 990 (8th Cir. 2007)("When an ALJ discounts a treating physician's opinion, he should give 'good reasons' for doing so."; quoting *Dolph v. Barnhart*, 308 F.3d 876, 878 (8th Cir. 2002)).

Here, in this magistrate judge's opinion, the ALJ's decision reflects that he properly reviewed and considered the medical records noted by Miller, including the records and opinions of Dr. Mooney and P.A. Morris, within the context of the entire record as a whole. (*See* A.R. 26-28.) The ALJ found Miller has the residual functional capacity to perform light work as defined in 20 C.F.R. § 404.1567(b) "except she can never balance, climb, or perform work around hazards such as moving machinery or dangerous equipment. [She] can perform only simple, routine, repetitive work that is of no more than regular pace and involves only occasional or superficial contact with the public." (A.R. 25.) In determining Miller's residual functional capacity, the ALJ appears to have given proper weight to the medical records and opinions of her treating physicians.

When determining whether a claimant can engage in substantial employment, the ALJ must

consider the combination of the claimant's mental and physical impairments and determine the claimant's residual functional capacity ("RFC"). *Masterson v. Barnhart,* 363 F.3d 731, 737 (8th Cir. 2004); *Baldwin v. Barnhart,* 349 F.3d 549, 556 (8th Cir. 2003). Residual functional capacity is a function-by-function assessment of an individual's ability to do work-related activities despite his or her physical or mental limitations. *See, e.g., Page v. Astrue,* 484 F.3d 1040, 1043 (8th Cir. 2007); *Roberson v. Astrue,* 481 F.3d 1020, 1023 (8th Cir. 2007). In other words, "[a] claimant's RFC represents the most he can do despite the combined effects of all of his credible limitations and must be based on all credible evidence." *McCoy v. Astrue*, 648 F.3d 605, 614 (8th Cir. 2011); *see also Martise*, 641 F.3d at 923; 20 C.F.R. § 404.1545.

"[A] claimant's RFC is a medical question and 'at least some' medical evidence must support the ALJ's RFC determination." *Wildman*, 596 F.3d at 968 (quoting *Lauer v. Apfel*, 245 F.3d 700, 704 (8th Cir. 2001)); *see also Martise*, 641 F.3d at 923. "The ALJ must assess a claimant's RFC based on all relevant, credible evidence in the record, including the medical records, observations of treating physicians and others, and an individual's own description of his limitations." *Goff v. Barnhart*, 421 F.3d 785, 793 (8th Cir. 2005) (internal citations and quotation marks omitted); 20 C.F.R. § 404.1545 ("We will assess your residual functional capacity based on all the relevant evidence in your case record.").

Upon review of the record as a whole here, this magistrate judge concludes that the ALJ determined Miller's residual functional capacity based on all the relevant, credible evidence including the medical records, observations and opinions of treating and consulting physicians, and Miller's own description of her limitations. (*See* A.R. 25-28.) In part, the ALJ stated as follows:

> After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to

cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional assessment.

The claimant was injured in a work-related injury on March 23, 2010. She related she was at work in the kitchen . . . and a colander fell from an overhead shelf and struck the bridge of her nose resulting in a small laceration. The claimant did not seek medical care until 48 hours later when she reported progressive vertigo after the injury. Examination showed only minor injury and a computed tomography (CT) showed no changes except for chronic sinus disease []. Since that time, she complained of short-term memory loss, ringing in her ears, visual difficulty, and headache.

The claimant's treating source noted she had no apparent problems walking into the examination, but when leaving she was holding onto the walls for balance. At follow-up she was unable to tandem walk or perform a Romberg test. She also reported monocular diplopia (double vision). She was treated with Meclizine and Amitriptyline without apparent benefit [].

Neurological examination was essentially normal except for episodic vertigo. The treating source indicated she was able to walk without assistance and was cautious due to fear of falling leg did not fall. She was able to walk on toes and heels. The treating source upon the pattern was not consistent with Meniere's or benign positional vertigo and he felt it could be some type of posttraumatic vertigo. She was referred to physical therapy for vestibular exercises, but later notes indicate multiple inconsistencies were noted at physical therapy and she did not fully comply. She had an video nystagmagram (ENG) that showed no non reproducible results and refused the caloric testing. An ear, nose and throat (ENT) evaluation showed normal audiogram and her treating source stated she had some type of non specific equilibrium. At a subsequent visit, she was using a cane although based on the neurological evaluation, the necessity for an assistive device was not documented. Her treating source stated her findings are dramatically out of proportion to the degree of her injury. He determined her complaints were not objectifiable []. It is noteworthy that the claimant has not been treated for vertigo and she has had little or no treatment since August 2010 for her stated disabling impairments [].

* * *

The objective evidence does not support a finding that the claimant is totally disabled under the Act. The medical evidence reveals she sustained a minor laceration to her nose. The balance of her complaints are subjective. Treating and examining physicians could find not [sic] basis for her subjective complaints and even though she claimed to experience vertigo, object tests proved to be normal. Her treating physician notes she was seen walking just fine, but later holding onto walls []. Not only does objective evidence not support her claim, the claimant tended to exaggerate the accident as well as her symptoms. The record shows she had a minor cut to her nose. The claimant alleged a multitude of physical and later

mental complaints. Even a treating physician noted that the weight of the colander changed every time she repeated the story. Weeks after her injury, she described being hit by a "cast iron" colander []. She alleged temper problems even though her significant other related no change in her temper []. The claimant also alleged depression, then she denied that depression would prevent her from working []. Despite her ongoing complaints of anxiety and depression (which her treating physician denotes are well controlled), the claimant contends she is unable to engage in activities of daily living. The record shows she does just about everything but household chores (which she allows her family to do.) While the consultative psychologist assessed cognitive dysfunction, depression and anxiety, he also assigned a GAF of 60 []. Essentially, this GAF demonstrates that she was not very limited by the stated impairments.

* * *

Based on the evidence and giving the claimant the full benefit of doubt, the undersigned concludes the claimant is capable of performing work activity within the above found residual functional capacity. To that end, she is able to lift and/or carry 20 pounds occasionally, 10 pounds frequently, sit, stand and/or walk for 6 hours in an 8 hour workday provided she never balances, climbs, or performs work around hazards such as moving machinery or dangerous equipment. These restrictions take into account her subjective complaints of episodic vertigo. Due to complaints of depression, anxiety, and cognitive difficulties, the claimant can perform only simple, routine, repetitive work that is of no more than regular pace and involves only occasional or superficial contact with the public.

* * *

In sum, the claimant has a history of vertigo for which a specific etiology has not been established by the medical evidence. Multiple treating and examining sources indicate the alleged limitations are out of proportion to the objective findings. The preponderance of evidence support that the claimant is capable of the level of activity as noted in the residual functional capacity and that the above residual functional capacity assessment is supported by the entirety of the medical evidence, opinion evidence, the evaluations of the State agency, and the partially credible statements of the claimant.

(A.R. 25-28.)[1]

Contrary to Miller's contention, this magistrate judge finds no error in the ALJ's evaluation

of the medical records or opinions of treating physicians in this case, and the conclusions reached

---

[1]   "The GAF is a numeric scale ranging from zero to one hundred used to rate social, occupational and psychological functioning 'on a hypothetical continuum of mental health-illness.'" *Halverson v. Astrue*, 600 F.3d 922, 925 n.4 (quoting American Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders,* 32-34 (4th ed. 2000) (DSM-IV)). "A GAF of 51 through 60 is characterized by moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or coworkers)." *Id.*

by the ALJ. Instead, this magistrate judge believes the findings of the ALJ related to those opinions are supported by substantial evidence in the record. Accordingly, the ALJ did not err in evaluating the medical opinions of treating physician Dr. Charles Mooney and Physician Assistant Mark Morris.

As expressed in the decision, "[b]ecause the medical record and [Miller's] behavior do not correlate with an inability to function, the [ALJ found Miller] is not fully credible." (A.R. 27.) Although not raised in her brief, Miller asserted in her Complaint that the ALJ improperly rejected her subjective allegations. (Complaint ¶ 20.)

The standards for evaluating a claimant's subjective complaints are well-established as set forth in *Polaski v. Heckler*, 739 F.2d 1320 (8th Cir. 1984).

> [T]he ALJ must consider the claimant's prior work history; daily activities; duration, frequency, and intensity of pain; dosage, effectiveness and side effects of medication; precipitating and aggravating factors; and functional restrictions. Another factor to be considered is the absence of objective medical evidence to support the complaints, although the ALJ may not discount a claimant's subjective complaints solely because they are unsupported by objective medical evidence. The ALJ is not required to discuss each *Polaski* factor as long as he acknowledges and considers the factors before discounting a claimant's subjective complaints.

*Jones v. Astrue*, 619 F.3d 963, 975 (8th Cir. 2010)(internal citations and quotations omitted); *see also Buckner v. Astrue*, 646 F.3d 549, 558 (8th Cir. 2011).

"Subjective complaints may be discounted if there are inconsistencies in the evidence as a whole." *Pearsall v. Massanari*, 274 F.3d 1211, 1218 (8th Cir. 2001)(citing *Polaski,* 739 F.2d at 1322); *see also Gonzales v. Barnhart*, 465 F.3d 890, 895 (8th Cir. 2006); *Eichelberger v. Barnhart*, 390 F.3d 584, 589 (8th Cir. 2004). The ALJ is required, however, to "'detail the reasons for discrediting the testimony and set forth the inconsistencies found.'" *Ford v. Astrue,* 518 F.3d 979, 982 (8th Cir. 2008)(quoting *Lewis v. Barnhart,* 353 F.3d 642, 647 (8th Cir. 2003)).

Where an ALJ seriously considers but for good reasons explicitly discredits a claimant's

subjective complaints, the court will not disturb the ALJ's credibility determination. *Johnson v. Apfel*, 240 F.3d 1145, 1148 (8th Cir. 2001); *Buckner*, 646 F.3d at 558. "'The credibility of a claimant's subjective testimony is primarily for the ALJ to decide, not the courts.'" *Bradley v. Astrue*, 528 F.3d 1113, 1115 (8th Cir. 2008)(quoting *Pearsall*, 274 F.3d at 1218). The court will "'defer to the ALJ's determinations regarding the credibility of testimony, so long as they are supported by good reasons and substantial evidence.'" *Pelkey v. Barnhart*, 433 F.3d 575, 578 (8th Cir. 2006)(quoted citation omitted).

In this magistrate judge's opinion, the ALJ's written decision sufficiently details the reasons for discrediting the subjective complaints of Miller and sets forth the inconsistencies found in the record. This judge further finds substantial evidence supports the credibility determinations made by the ALJ. As a result, Miller's challenge to the ALJ's rejection of her subjective allegations is not persuasive.

**B.    WHETHER THE ALJ FAILED TO PROPERLY EVALUATE MILLER'S NEED FOR A CANE OR ASSISTIVE DEVICE FOR STANDING AND WALKING.**

Miller asserts that "[t]he ALJ erred by not including [her] use of a cane in the residual functional capacity assessment and by not adequately discussing the reasons for excluding it." (Plaintiff's Brief p. 19.) Miller complains that the only reference in the ALJ's decision regarding her use of the cane was the following statement: "At a subsequent visit, she was using a cane although based on the neurological evaluation, the necessity for an assistive device was not documented." (A.R. 26.) Miller argues that the ALJ was incorrect in concluding that the necessity of an assistive device was not documented, and refers to the records of Dr. Acosta and Dr. Prater. (Plaintiff's Brief pp. 19-20.)

This magistrate judge disagrees. Upon review of the administrative record as a whole, and given the credibility determinations of the ALJ, there is substantial evidence in the record

supporting the ALJ's finding that "the necessity for an assistive device was not documented."

The record tends to indicate Miller purchased and began using a cane at the recommendation of the physical therapist based upon Miller's own subjective complaints of dizziness and instability. (*See* A.R. 288, 289, 290, 293.) However, upon examining Miller on May 4, 2010, Dr. Acosta found she "was able to walk without assistance." (A.R. 319.) On May 7th, Dr. Mooney noted Miller "walks down the hall, putting her hands on the walls to steady herself. She will hold to the right and then to the left. She does not appear to actually be falling to one side or the other. Her Romberg testing is very reluctant, but she does not appear to distinctly fall to one side or the other. She does not demonstrate any vertigo." (A.R. 321.) In July of 2010, Dr. Mooney noted that Miller "continues to walk with a cane," but in assessing her symptoms of ongoing imbalance, he stated: "I am at a loss to explain her symptoms and continue to feel that her symptoms are vastly outside of any of the objective findings or even a mechanism of injury." (A.R. 345.) In August of 2010, Dr. Mooney opined that Miller could not return to work based on "the fact that *she now feels she needs* a cane because of instability." (A.R. 346 (emphasis added).) In light of those notes and other objective findings in the medical records, there is substantial evidence supporting the ALJ's finding that the necessity for a cane was not documented but, instead, was based on Miller's subjective complaints which were questioned by the physicians and the ALJ.

## C.     WHETHER THE ALJ FAILED TO PROPERLY EVALUATE THE OPINIONS OF DR. KENNETH MILLS.

Miller contends that "[t]he ALJ discounted the opinions of the examining neuropsychologist [Dr. Kenneth Mills], but failed to explain the basis for that decision." (Plaintiff's Brief p. 21.) She further argues that "[t]he ALJ failed to include all of Dr. Mill's specific limitations in assessing [her] mental residual functional capacity." (*Id.*) According to Miller, the limitations should have included "the need to rehearse several times even basic

instructions; the need for frequent reminders; the need for direct supervision; and a slower pace."

(*Id.*)   Miller asserts the ALJ erred in failing to adopt those limitations or "provide any cogent basis for rejecting Dr. Mills' opinions." (*Id.* p. 22.)

In this magistrate judge's opinion, the ALJ properly evaluated and considered the opinions of Dr. Mills.   In his decision the ALJ noted:

> On January 6, 2011, Kenneth R. Miller Ph.D. performed a neuropsychological evaluation of the claimant.   Test data revealed slowed mental processing and borderline auditory recall. Although her demonstrated affect was normothymic, she reported ongoing symptoms of severe anxious depression. Based upon his testing and interview data, Dr. Miller diagnosed adjustment disorder with mixed anxiety and depressed mood; cognitive disorder, not otherwise specified; postconcussional syndrome. He assigned a Global Assessment of Functioning (GAF) score of 60 [].
>
> * * *
>
> As for the opinion evidence, the consultative psychologist opined the claimant appeared able to accomplish her basic activities of daily life (grooming, hygiene, dressing) with no assistance and she was competent to manage cash benefits.   He noted she would likely be able to understand basis [sic] instructions, procedures, and locations on the work site, if they were rehearsed several times. She may require direct supervision and frequent repetition to learn job responsibilities. Her mnestic abilities were poor, however, and frequent reminders may be necessary. Her ability to carry out job-related instructions may be limited by her poor recall. Maintenance of attention, concentration and pace may be somewhat impaired as a result of her mnestic compromise. Her ability to interact appropriately with co-workers, supervisors and the public would appear to be within normal limits, except during periods of exacerbated depression. Further, Dr. Miller opined she may experience mild difficulty adjusting to significant changes in the workplace and her ability to use good judgment in the workplace might be limited by her anxiety and depression [].
>
> To the extent that simple, routine, repetitive work activity of regular pace reduces the need for significant changes in the workplace and exercise of judgment on the part of the claimant in the workplace, this opinion is given some weight. Moreover, the residual functional capacity provides for limit in contact with others, i.e. coworkers, supervisors, the general public, to that the undersigned has given D. Miller's opinion some weight.

(A.R. 26-28.)

This magistrate judge finds no error in the ALJ's evaluation of the opinions of Dr. Mills.

The ALJ is not required, as asserted by Miller, to adopt each specific limitation opined by Dr. Mills. Moreover, the ALJ provided good reasons for giving the weight he did to the doctor's opinions. In this magistrate judge's view, the findings of the ALJ related to Dr. Mills opinions are supported by substantial evidence in the record.

**D.      WHETHER THE ALJ ERRED IN APPLYING THE MEDICAL-VOCATIONAL GUIDELINES IN A MECHANICAL MANNER BY FAILING TO CONSIDER MILLER AS BEING OF "ADVANCED AGE."**

Miller contends the ALJ erred in failing to consider whether she qualified as "advanced age." (Plaintiff's Brief p. 22.) As of the date of the ALJ's decision, Miller was 54 years and six and a half months old. Miller acknowledges that "advanced age" generally refers to someone age 55 to 59 but argues the category can include someone at her age under Eighth Circuit precedent. (*Id.*) She argues that if the ALJ had properly considered her to be "advanced age" she would be determined to be disabled under all the other factors. (*Id.*) She urges this Court to reverse the ALJ's decision and remand the matter for further consideration of her age. (*Id.* p. 25.)

Miller cites to *Phillips v. Astrue*, 671 F.3d 699 (8th Cir. 2012). There, the Eighth Circuit addressed "whether the Commissioner failed to consider whether Phillips, who was four months shy of her fifty-fifth birthday, should have been classified as being of 'advanced age,' rather than 'closely approaching advanced age,' which impacts her disability determination." *Id.* at 701. Because the Eighth Circuit was "unable to determine from the record whether the Commissioner considered whether Phillips should be moved to the higher category," the case was remanded for further proceedings. *Id.* As explained by the *Phillips* court,

> [t]he medical-vocational guidelines, or grids, are a set of charts listing certain vocational profiles that warrant a finding of disability or non-disability. The grids come into play at step five of the analysis, where the burden shifts to the Commissioner to show that the claimant has the physical residual capacity to perform a significant number of other jobs in the national economy that are consistent with her impairments and vocational factors such as age, education, and

work experience. If the ALJ's findings as to RFC, age, education, and work experience fit any of the combinations of those criteria contained in the Tables in Appendix 2 to Part 404, then the ALJ must reach the conclusion (either 'disabled' or 'not disabled') directed by the relevant Rule or line of the applicable Table.

*Id.* at 702 (quotation marks and citations omitted). "Under the guidelines, three age categories are specified: a younger person (under age 50), a person closely approaching advanced age (ages 50-54), and a person of advanced age (age 55 or older)." *Id.* (citing 20 C.F.R. § 404.1563(c)-(e)). As further explained by the Eighth Circuit, "[u]nder the regulations, the age categories are not applied mechanically in a borderline situation." *Id.* (citing 20 C.F.R. § 404.1563(b)).

Instead, if a claimant is "within a few days to a few months of reaching an older age category, and using the older age category would result in a determination or decision that [the claimant is] disabled, [the agency] will consider whether to use the older age category after evaluating the overall impact of all the factors of [the claimant's] case." To determine whether to apply the claimant's chronological age or the higher age, the Council adopted a "sliding scale" approach whereby "the claimant must show progressively more additional vocational adversity(ies) – to support use of the higher age – as the time period between the claimant's actual age and his or her attainment of the next higher age category lengthens." If the claimant does not show "additional adversity(ies) justifying use of the higher age category, the adjudicator will use the claimant's chronological age – even when the time period is only a few days [and] [t]he adjudicator need not explain his or her use of the claimant's chronological age.

*Id.* (citations omitted) (alterations in original).

"Exactly what constitutes a borderline situation is not defined by statute or regulation, other than the 'few days to a few months' language mentioned above." *Id.* at 703. Phillips argued "a consensus has developed establishing a borderline situation exists where the claimant is within six months from the next age category." *Id.* The Commissioner asserted "no such fixed guidelines exist," and noted other courts had "concluded a borderline situation did not exist where the claimant was four months from the older age category." *Id.* The Eighth Circuit "decline[d] to draw a bright line for purposes of [the *Phillips*] case. *Id.*

Based on its "review of the case law and the circumstances of [the] case," the Eighth Circuit

held "that Phillips's four-month time period constitutes a borderline situation." *Id.* It was emphasized that "in addition to the close time period between the categories, . . . Phillips established at least one additional vocational adversity justifying the use of the higher age category. Namely, Phillips has no past relevant work, which in certain circumstances may be sufficient to establish an additional vocational adversity." *Id.* The Eighth Circuit concluded that "a borderline situation existed because Phillips was four months shy of her fifty-fifth birthday, she established at least one additional vocational adversity, and if the higher age category were used, it would result in a determination of disability." *Id.* at 704

As a result, the Eighth Circuit indicated that "while the Commissioner was not required to apply the higher age category, he was required to consider applying the next category." *Id.* As further explained,

> detailed findings in borderline situations are not necessary. However, it is this court's job to review whether substantial evidence exists to support the Commissioner's decision, and we simply cannot complete this review without some showing as to the Commissioner's consideration of applying the higher age category, which he indisputably is required to do.

*Id.* at 706. "[A] mere statement by the Commissioner that he considered the borderline situation would likely suffice." *Id.* But "[s]imply noting [the claimant's] age and her current age category fails to answer the precise question at hand – whether her borderline situation warranted moving her to the next category." *Id.* "'In a case in which the claimant's age indicates that he or she might well fall within a borderline age category, the ALJ's failure to note that the ALJ has considered whether a claimant falls within a borderline category and, if so, whether bumping the claimant up is warranted, constitutes a failure to offer findings of fact and reasons for the decision.'" *Id.* at 707 (citation omitted).

Because the *Phillips* court was "unable to determine from the record if the Commissioner

considered whether Phillips should be moved to the higher age category," it concluded that "substantial evidence [did] not support the Commissioner's decision." *Id.* Consequently, the case was remanded to the Commissioner for further proceedings. *Id.*

The Eighth Circuit addressed the borderline situation again in *Byes v. Astrue*, 687 F.3d 913 (8th Cir. 2012). There, Byes argued that the ALJ's application of an incorrect grid rule was not harmless error, as found by the district court, because he would have been eligible for benefits "if the ALJ had correctly found that he could not perform light work and had recognized his borderline-age situation." *Id.* at 917. The Eighth Circuit disagreed and held the ALJ's error was harmless for three reasons. *Id.* First, the court noted that "section 404.1563(b) does not require that an ALJ apply an older age category in borderline situations. According to the regulation, the ALJ is required only to '*consider* whether to use the older age category.'" *Id.* at 917-18.

Second, the Eighth Circuit found that Byes' age was not borderline. *Id.* at 918. Byes was almost eight months away from his 45th birthday when the ALJ issued the decision. *Id.* The court noted "there is no bright line for how many months constitute a borderline case" but held "eight months is too distant to be borderline." *Id.* (citing *Bowie v. Commissioner*, 539 F.3d 395, 397 (6th Cir. 2008)(claimant less than two months from birthday is not borderline); *Lockwood v. Commissioner*, 616 F.3d 1068, 1072-74 (9th Cir. 2010)(claimant only one month and three days from birthday is not borderline); *Van Der Maas v. Commissioner of Social Sec.*, 198 Fed.Appx. 521, 528 (6th Cir. 2006)(taking into account all factors surrounding claimant's application, 55 days is not borderline); *Roberts v. Barnhart*, 139 Fed.Appx. 418, 420 (3d Cir. 2005)(persons within five to six months of their birthday are not borderline); *Lambert v. Chater*, 96 F.3d 469, 470 (10th Cir. 1996)(seven months short of birthday is not borderline)). The *Byes* court noted that "[t]he most favorable decision – holding that four months was borderline – comes from [the Eighth Circuit],

and does not aid Byes. *Id.* (citing *Phillips*, 671 F.3d at 703-04).    Finally, the *Byes* court found that "even if the ALJ had given Byes the benefit of the higher 45-49 age group, he would still have been not disabled" under the applicable grid rule. *Id.*

In the present case, the ALJ found Miller "was born on October 24, 1957, and was 52 years old, which is defined as an individual closely approaching advanced age, on the alleged disability onset date (20 CFR 404.1563)." (A.R. 28.)    There is no indication in the ALJ's decision that consideration was given to whether Miller presented a borderline situation and should be classified in the category of advanced age.    In this magistrate judge's opinion, and under the principles set forth in *Phillips*, the failure to do so was error.

Miller was born on October 24, 1957, and the ALJ issued his decision on May 9, 2012. Thus, the ALJ made the decision regarding Miller's qualification for benefits approximately five and a half months before Miller turned 55 years of age.    While there is no bright line, the case law precedent and circumstances of this particular case support a finding of a borderline situation. Consequently, under *Phillips*, the ALJ "was required to consider applying the [advanced age] category" in determining whether Miller was disabled. *Phillips*, 671 F.3d at 706.    Because there is not even a "mere statement" by the ALJ that he considered whether Miller should be moved to the higher "advanced age" category, there is a lack of substantial evidence to support the ALJ's decision. *Id.* at 706-07.

In resistance, the Commissioner asserts that "the ALJ properly considered" Miller's age and the facts of the case do not present a borderline situation. (Defendant's Brief pp. 11-15.)    In this magistrate judge's opinion, the Commissioner's arguments are unpersuasive.    The Commissioner cites to *Byes* but the nearly eight month gap at issue there is significantly greater than the approximate five and a half months involved here in determining whether the claimant's

age is borderline.   It is also noteworthy that the Commissioner here does not suggest the ALJ's failure to consider Miller as being of advanced age was harmless error as held in the *Byes* case. In her brief, Miller asserts that if she was classified as "advanced age" she would be disabled under Vocational Rule 202.06, based on the other factors and findings of the ALJ. (*See* Plaintiff's Brief pp. 22, 23 & 24.)   The Commissioner does not contest, or even address, Miller's contention.

## VII.   CONCLUSION & RECOMMENDATION

After a thorough review of the entire record and in accordance with the standard of review the Court must follow, this magistrate judge concludes that the ALJ's decision is supported by substantial evidence in the record as to the evaluation of the medical opinions in this case, including claimant Pauline Miller's need for a cane or other assistive device, and as to the assessment of the credibility of Miller's subjective complaints.   However, the record fails to show that the ALJ considered whether Miller should have been classified as being of "advanced age" rather than "closely approaching advanced age" in determining disability. Accordingly, it is recommended that this case be remanded for further proceedings.

Pursuant to Federal Rule of Civil Procedure 72(b)(2), the parties shall have 14 days from the date of this Report and Recommendation to serve and file specific objections to the proposed findings and recommendations.

Dated March 3, 2015.

_Helen C. Adams_

**HELEN C. ADAMS**
**UNITED STATES MAGISTRATE JUDGE**